IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALLISON A. ROWE,

                Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

Case No. 3:17-cv-00362-SB

**OPINION AND ORDER**

---

**BECKERMAN, Magistrate Judge.**

Allison Rowe ("Plaintiff") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her applications for Social Security disability insurance benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

PAGE 1 – OPINION AND ORDER

# BACKGROUND

Rowe was born in July 1973, making her thirty-seven years old on October 31, 2010, the alleged disability onset date. (Tr. 105, 132.) She has a high school education, and her past relevant employment includes appointment scheduler, receptionist, sales associate, and cashier. (Tr. 39, 375.) In her applications for benefits, Rowe alleges disability due to diabetes, depression, anxiety, sciatica, and back problems, such as a bulging disc and "[n]arrowing canal." (Tr. 105, 132.)

On June 8, 2010, roughly four and a half months before the alleged onset of disability, Plaintiff presented for a follow-up visit with her primary care physician, Dr. Lori Gluck ("Dr. Gluck"), regarding her diabetes. During the visit, Plaintiff reported that she recently "[j]oined 24 hour fitness" and "[r]eally likes it," and that she engages in exercise five days a week (walking, using the treadmill for thirty minutes, or swimming laps for twenty minutes). (Tr. 565.)

On July 27, 2010, Plaintiff presented for a consultation regarding the ongoing management of her diabetes. Plaintiff reported that she was "[g]oing on vacation next week to . . . Disneyland and [Las] Vegas," that she was not "checking blood sugars every day as she is supposed to," that she was "[e]ating out every day [and] no[t] cooking at home," and that she had "not been to the gym at all" over the course of the last three weeks because she was "being lazy." (Tr. 559.) Dr. Heidi Chinwuba ("Dr. Chinwuba"), a doctor of pharmacy, noted that she had a "[f]rank discussion" with Plaintiff about "her ongoing poor life choices," and observed that Plaintiff "[k]nows she needs to change, but [she is] not willing to doing anything about it." (Tr. 560.)

On October 19, 2010, Plaintiff presented for a follow-up visit with Dr. Chinwuba. Plaintiff reported that she had improved her compliance with the prescribed insulin regimen (i.e.,

checking her blood sugars at least three times a day and administering dosages of insulin), but she still was not exercising and she "quit [her] job" after a recent bout with an illness. (Tr. 532-33; *see also* Tr. 552, noting on September 21, 2010, that Plaintiff reported starting "work yesterday").

On November 16, 2010, Plaintiff informed Dr. Chinwuba that she had made "no change" to her diet, and that she had been "going bowling every Saturday," even though her activity level was reportedly limited "due to recent back pain." (Tr. 523.) Dr. Chinwuba noted that Plaintiff had gained ten pounds since her last visit, and that Plaintiff was told "to get into counseling [and] find someone to help her with motivation so that she can make permanent lifestyle changes." (Tr. 524.)

On November 22, 2010, x-rays of Plaintiff's lumbar spine revealed "[s]evere arthritic change at L5-S1," "[m]inor arthritic change elsewhere," and "atherosclerotic change of the aorta," which Plaintiff's radiologist felt was "unusual" for a thirty-seven year old. (Tr. 522.)

On November 23, 2010, Dr. Gluck noted that Plaintiff was "asking about disability" and she had a "[v]ery serious talk" with Plaintiff about how her weight impacts her health, given the recent x-rays showing "severe [osteoarthritis] in [her] back and signif[icant] atherosclerosis in [her] aorta."[1] (Tr. 519.) Dr. Gluck added that Plaintiff has a "food addiction and needs help." (Tr. 520.)

On January 11, 2011, Plaintiff informed Dr. Gluck that she was "[d]oing [a] volunteer job at DHS," and that physical activity, such as lifting or standing, causes her back to hurt, but "[s]itting is fine." (Tr. 507; *see also* Tr. 504, noting on January 19, 2011, that Plaintiff was doing

---

[1] "Atherosclerosis is the pathological process whereby deposits of cholesterol and other substances narrow and obstruct the artery walls of the heart." *New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

"[o]n the job training type of work for DHS" that involved "filing" and being on her "feet a lot" during the day).

On February 10, 2011, Plaintiff underwent a magnetic resonance imaging ("MRI") scan of her lumbar spine, which revealed "[m]oderate left . . . foraminal stenosis" at the L5-S1 level. (Tr. 446.)

On May 3, 2011, Dr. Joshua Boyd ("Dr. Boyd"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 109-10.) Dr. Boyd concluded that the limitations imposed by Plaintiff's impairments failed to satisfy listing 12.04 (affective disorders).

On May 11, 2011, Dr. John Crites ("Dr. Crites"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 111-12.) Based on his review of the medical record, Dr. Crites concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull in accordance with her lifting and carrying restrictions; frequently balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; and balance and climb ramps and stairs without limitation. Dr. Crites added that Plaintiff does not suffer from any manipulative, visual, communicative, or environmental limitations.

On September 8, 2011, Dr. Dorothy Anderson ("Dr. Anderson"), a non-examining state agency psychologist, issued a psychiatric review technique assessment. (Tr. 137-38.) Dr. Anderson agreed with Dr. Boyd's conclusion that Plaintiff's impairments failed to satisfy listing 12.04.

On September 9, 2011, Dr. Sharon Eder ("Dr. Eder"), a non-examining state agency physician, issued a physical residual functional capacity assessment. (Tr. 138-40.) Based on her review of the medical record, Dr. Eder concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull in accordance with her lift and carry restrictions; frequently stoop, kneel, crouch, and crawl; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and balance without limitation. Dr. Eder also concluded that Plaintiff does not suffer from manipulative, visual, or communicative limitations, but she does need to avoid even moderate exposure to workplace hazards, such as machinery and heights (environmental limitations).

On September 16, 2011, Plaintiff informed Dr. Heather Miller ("Dr. Miller"), a doctor of pharmacy, that she stopped taking insulin six weeks ago and stopped exercising about a month ago. (Tr. 795.) Plaintiff added that she cooked at home for a week because "she was sick of eating out." (Tr. 795.)

In a letter dated June 20, 2012, Daniel Schroeder ("Schroeder"), a psychiatric mental health nurse practitioner, stated that he had not seen Plaintiff in "several months" and assumed that she wanted "to end treatment with [him]." (Tr. 937.) After Plaintiff failed to respond to Schroeder's letter, he issued a Case Closure Summary stating that Plaintiff "was non-compliant with treatment plan, contract and/or [Western Psychological and Counseling Services] policies." (Tr. 936.)

On November 1, 2012, Plaintiff visited Dr. Leonard Hubert ("Dr. Hubert"), a neurologist, based on complaints of chronic migraines. Dr. Hubert determined that Plaintiff's headaches were "probably" related to her overuse of Excedrin, and he advised Plaintiff to stop taking "Excedrin

like drug[s]" and to use her continuous positive airway pressure machine "every night." (Tr. 986.)

On January 4, 2013, Katy Powell ("Powell"), a treating psychiatric mental health nurse practitioner, assigned Plaintiff a Global Assessment of Functioning ("GAF") score of sixty-five.[2] (Tr. 1938.) Powell observed that Plaintiff suffers from the following impairments: a generalized anxiety disorder, an eating disorder, a recurrent depressive disorder that is "in remission," obesity, diabetes, chronic back pain, and hypertension. (Tr. 1938.)

In a letter dated January 29, 2013, Dr. Gluck stated that Plaintiff "could work with accommodations," but she "could not do a job requiring standing for any extended periods of time[.]" (Tr. 1087.) Dr. Gluck added that Plaintiff "[c]ould work a [six] hour day . . . at a desk job," and that Plaintiff should take one-minute "stretch breaks" after thirty minutes of sitting. (Tr. 1087.)

On June 6, 2013, Plaintiff was referred to Dr. Jill Brenizer ("Dr. Brenizer") for a cognitive, learning, and psychological assessment. (Tr. 1088-1105.) After conducting a clinical interview, reviewing certain medical records, conducting a mental status examination, and administering a battery of tests, Dr. Brenizer diagnosed Plaintiff with social phobia and a generalized anxiety disorder, and assigned a GAF score of sixty-five. (Tr. 1100.) Dr. Brenizer added that Plaintiff would perform better in jobs where she "has limited contact with other people" and is limited to a "routine" and "predictable" set of "basic and repetitive" tasks. (Tr.

_____

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (citation omitted). A GAF score of sixty-one to seventy reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Vititoe v. Colvin*, 549 F. App'x 723, 726 n.2 (10th Cir. 2013) (citation and quotation marks omitted).

1104.) Dr. Brenizer also noted that she administered a Personality Assessment Inventory (344 multiple-choice "items" that are "designed to provide an assessment of factors that could distort the results of testing"), and there were "some signs indicating [Plaintiff] may tend to portray herself in an unduly negative light" and thus it was "possible that there is an element of exaggeration of complaints and problems combined with a tendency to minimize or downplay positive aspects of particular areas." (Tr. 1097-98.) Dr. Brenizer further observed that it was "possible the clinical features scales are overly elevated as a result of this response style." (Tr. 1098.)

On November 8, 2013, Plaintiff underwent an MRI scan of the brain based on complaints of chronic headaches that were "worsening over the past two months." (Tr. 1143.) The MRI of Plaintiff's brain revealed "[t]hree extra-axial lesions with features consistent with meningiomas."[3] (Tr. 1143.) A magnetic resonance angiogram ("MRA") of Plaintiff's head also revealed the presence of "[d]iffuse atherosclerotic plaque without significant flow reduction." (Tr. 1141.)

On November 20, 2013, Dr. Daniel Lennen ("Dr. Lennen"), a treating psychologist, assigned Plaintiff a GAF score of sixty-five and noted that she suffers from a generalized anxiety disorder. (Tr. 1276.)

On January 6, 2014, Plaintiff underwent a "[r]ight parietal craniotomy" in order to resect the "large right frontoparietal meningioma" that was reportedly causing weakness in her left leg. (Tr. 1118.) Two weeks later, Plaintiff reported experiencing "marked improvement in the left leg weakness she had" and being able to ambulate "without assistance." (Tr. 1116.) Plaintiff also exhibited "5/5 strength in bilateral upper and lower extremities with good range of motion." (Tr.

---

[3] A meningioma is "a tumor of the protective membrane around the brain and spinal cord." *Garcia v. Pfizer, Inc.*, 268 F. App'x 270, 271 (5th Cir. 2008) (per curiam).

1116; *see also* Tr. 1605, 1608, noting on February 13, 2014, that the weakness in Plaintiff's left leg "has resolved and that Plaintiff's "[h]eadaches severity and frequency have decreased since surgery").

On January 27, 2014, Plaintiff underwent the "second stage" of her large tumor resection. (Tr. 1106, 1112, 1952.)

On March 5 and March 7, 2014, Plaintiff underwent surgery to address her remaining tumors. (Tr. 1966, 1978, 1986.) Two days later, Plaintiff had a cerebral spinal fluid ("CSF") leak repaired. (Tr. 1973, 1978.) On March 17, 2014, Plaintiff was discharged from the hospital. (Tr. 1978.)

In a letter to Dr. Gluck dated April 7, 2014, Plaintiff's surgeon, Dr. Pankaj Gore ("Dr. Gore"), noted that Plaintiff was "[d]oing well after resection of [three benign] meningiomas," that Dr. Gore "had to leave a very small [one millimeter] focus of tumor adherent to the left optic nerve," that the CSF leak was "repaired without further complication," that Plaintiff's gait and station were normal, and that Plaintiff exhibited full "strength in bilateral upper and lower extremities." (Tr. 1975-76.)

On May 30, 2014, an x-ray of Plaintiff's right ankle revealed a "[s]mall avulsion fracture of the inferior aspect of the fibula." (Tr. 1675.) Plaintiff was advised to wear a walking boot for three weeks.

Between June 19 and October 9, 2014, Plaintiff attended thirteen therapy sessions with Dr. Lennen regarding, *inter alia*, Plaintiff's eating habits and complaints of anxiety. Dr. Lennen assigned Plaintiff a GAF score of seventy throughout this time period, and on several occasions, Dr. Lennen added that Plaintiff's "condition is much improved since the initiation of treatment." (Tr. 2051-76.)

On October 10, 2014, an MRI of Plaintiff's brain revealed "[e]xpected postsurgical changes following [the] resection of [Plaintiff's three] . . . meningiomas," "[n]o sign of recurrent or significant residual tumor," and "[n]o sign of acute intracranial abnormality." (Tr. 1853, 1962.)

On November 13, 2014, Dr. Gore noted that Plaintiff had "no complaints and is doing very well," and that Plaintiff exhibited full "strength in bilateral upper and lower extremities." (Tr. 1965.)

On April 10, 2015, an MRI of Plaintiff's brain revealed "[s]table postoperative changes" and "[n]o obvious acute abnormality." (Tr. 1954.)

On April 29, 2015, Plaintiff visited Dr. Lennen and reported that she had "been gambling more frequently." (Tr. 2015.) Dr. Lennen continued to assign Plaintiff a GAF score of seventy and observed that Plaintiff's "condition is much improved since the initiation of treatment." (Tr. 2015-16.)

On June 13, 2015, Dr. Lennen advised Plaintiff to "[u]se fantasy to create an[] aversive condition around gambling," noted that her "condition is much improved," and assigned a GAF score of seventy. (Tr. 2007-08.)

On July 6, 2015, Plaintiff was referred to Dr. Cheryl Brischetto ("Dr. Brischetto") for a psychodiagnostic examination. (Tr. 1145-52.) After conducting a clinical interview, performing a mental status examination, administering a battery of tests, and reviewing Dr. Brenizer's assessment, Dr. Brischetto diagnosed Plaintiff with an adjustment disorder with anxiety and ruled out personality traits and an adjustment disorder with depression. (Tr. 1145, 1152.) Dr. Brischetto, however, also observed that: (1) Plaintiff "was not seen as a fully reliable historian," (2) "[t]here were some discrepancies noted in her current report from information in

[Dr. Brenizer's] 2013 report," (3) Dr. Brischetto "had some concerns about full effort on mental status tasks" and believed that "full effort on mental status was questionable," which meant that "the data obtained may under reflect her current functioning," (4) although Plaintiff reported that "she could not sit for more than [thirty] minutes, she did not get up for the entire hour," even though Dr. Brischetto "gave her the opportunity to get up and stretch," and (5) in Dr. Brischetto's opinion, it was "likely" that Plaintiff's reports on the Beck Anxiety and Depression Inventories represented "some exaggerated self-reporting, as they seemed inconsistent . . . with her functioning in activities of daily living and emotional presentation" during the examination. (Tr. 1149-51.)

Also on July 6, 2015, Dr. Brischetto completed a medical source statement, wherein she opined that Plaintiff suffers from moderate impairment (i.e., "more than a slight limitation in this area, but the individual is still able to function satisfactorily") in her ability to understand and remember complex tasks, carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with co-workers. (Tr. 1154-55.) Dr. Brischetto also opined that Plaintiff suffers from mild impairment (i.e., "slight limitation in this area, but the individual can generally function well") in her ability to interact appropriately with the public and supervisors, and to respond appropriately to "usual work situations" and changes in routine. (Tr. 1154-55.)

On November 19, 2015, an Administrative Law Judge ("ALJ") posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at an administrative hearing. (Tr. 48-72.) First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work that involves "standing and walking for no more than two hours out of an eight-hour day," occasionally climbing, balancing,

stooping, kneeling, crouching, and crawling (i.e., postural activities), avoiding "even moderate exposure to workplace hazards," and engaging in only "occasional in-person contact but no limitations with regard to phone contact." (Tr. 65-66.) The VE testified that the hypothetical worker could perform Plaintiff's past relevant work as an appointment scheduler, but added that Plaintiff's past receptionist and "cashiering [jobs] would require more than occasional public contact. (Tr. 66.) Second, the ALJ asked the VE to assume that the hypothetical worker also needed to be allowed to "change from sitting to standing position once every [thirty] minutes" outside of normal breaks, resulting in "around [twelve] one-minute stretch breaks." (Tr. 66.) The VE testified that the hypothetical worker could still perform the job of appointment scheduler, and could also be employed as an officer helper/assistant and small products assembler. (Tr. 66-68.)

Plaintiff's attorney also posed questions to the VE who testified at the administrative hearing. In response to those questions, the VE indicated that the hypothetical worker could not sustain competitive employment if she was off task at least twenty percent of the time due to her impairments, or if she "unpredictably would miss at least two [work]days out of a month." (Tr. 69.)

In a written decision issued on January 5, 2016, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed.

# THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 24-40.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 31, 2010, the alleged disability onset date. (Tr. 26.) At step two, the ALJ determined that Plaintiff had the following severe impairments: "[O]besity, sciatica, arthritis of the lumbar spine at L5-S1, diabetes, adjustment disorder with mixed emotional features, anxiety disorder, eating disorder . . . , depressive disorder, and headaches." (Tr. 27.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 28.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work that involves standing and walking two hours, occasionally climbing, crawling, stooping, crouching, kneeling, and balancing, avoiding "even moderate exposure to workplace hazards," changing "from seated to standing once every thirty minutes for more than one minute (with the exception of regularly scheduled breaks and the lunch period)," and engaging in "occasional in-person contact." (Tr. 30.) At step four, the ALJ concluded that Plaintiff is not disabled because she can perform her past relevant work as a receptionist and appointment scheduler. (Tr. 38.) At step five, the ALJ made an alternative finding that Plaintiff can also perform other jobs that exist in significant numbers in the national economy, including work as an office helper/assistant and small products assembler. (Tr. 39-40.) Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d

880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony; and (2) failing to find that Plaintiff's "three meningiomas . . . and status post meningioma removal" was a severe impairment at step two of the sequential process. (Pl.'s Opening Br. at 5.) As explained below, the Court finds that the ALJ's decision is free of harmful legal error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's denial of Plaintiff's applications for benefits.

## I. PLAINTIFF'S SYMPTOM TESTIMONY

### A. Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664,

678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).[4]

---

[4] Plaintiff argues that Social Security Ruling ("SSR") 16-3p—which went into effect on March 28, 2016—should apply to the ALJ's consideration of her subjective symptom testimony. (*See* Pl.'s Opening Br. at 20, "SSR 16-3p applies retroactively to this case.") In late October 2017, after Plaintiff filed her opening brief, "the Social Security Administration republished SSR 16-3p and clarified that a reviewing court should 'use[] the rules that were in effect at the time' of the decision under review." *Duke v. Comm'r Soc. Sec. Admin.*, No. 6:16-cv-02176-SI, 2018 WL 575058, at *3 n.1 (D. Or. Jan. 26, 2018). Accordingly, SSR 16-3p does not apply to the ALJ's final decision from which Plaintiff appeals, because it was issued on January 5, 2016. *See id.*; *see also Cassel v. Berryhill*, 706 F. App'x 430, 431 (9th Cir. 2017) (holding that the ALJ "properly evaluated the consistency" of the claimant's "symptom testimony with other [record]

## B.     Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or symptoms alleged. (*See* Tr. 31, "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms"). Accordingly, the ALJ was required to provide specific, clear, and convincing reasons for discrediting Plaintiff's subjective symptom testimony. (*See* Def.'s Br. at 10-12, arguing that the ALJ provided clear and convincing reasons). The ALJ met that standard here.

First, the ALJ discounted Plaintiff's subjective symptom testimony on the ground that her daily activities "are inconsistent with allegations of debilitating symptoms from diabetes, anxiety, depression, headaches, an eating disorder, and a spine condition." (Tr. 31.) "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support [an ALJ's subjective symptom analysis]." *Martin v. Colvin*, No. 3:14–cv–01603–SB, 2016 WL 890106, at *8 (D. Or. Feb. 9, 2016) (citation omitted); *see also Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, including the fact that the claimant's self-reported activities "were inconsistent with [the claimant's] estimation of her abilities"). In support of this finding, the ALJ observed that despite claiming disabling symptoms, Plaintiff remained able to bowl on a weekly basis in November 2010, attend "water aerobics three to five days a week," work out "five times a week," take regular walks, use social media on a frequent basis, socialize with those who participated in "her water aerobics classes," go shopping with her son, go out "to

evidence," and stating that "SSR 16-3p is consistent with existing [Ninth] Circuit precedent on evaluating claimant [symptom] testimony" (citing *Trevizo*, 871 F.3d at 678 n.5)).

dinner with friends or family three to four times a week," drive her son to school in 2011, "maintain her hygiene and pay her bills," and go on a vacation to Las Vegas in August 2013. (Tr. 31-32.)

Plaintiff argues that the ALJ's reliance on her reported activities was erroneous because (1) none of the cited activities are "relevant" or "pertain[] to" her meningioma-related symptoms, (2) "[n]one of the isolated periods of activities noted by the ALJ contradict" Plaintiff's meningioma-related symptoms, and thus (3) the ALJ failed to meet the specificity requirements explained in *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015). (Pl.'s Opening Br. at 21-22; Pl.'s Reply at 6.)

In *Brown-Hunter*, the ALJ "stated only that she found, based on unspecified claimant testimony and a summary of medical evidence, that 'the functional limitations from the claimant's impairments were less serious than she has alleged.'" 806 F.3d at 493. The Ninth Circuit held that the ALJ's symptom analysis was erroneous, noting that a reviewing court could not "discern the agency's path because the ALJ made only a general credibility finding without providing any reviewable reasons why she found [the claimant's] testimony to be not credible." *Id.* at 494.

Unlike *Brown-Hunter*, in this case, the Court is able to "reasonably discern" the ALJ's path. *Cf. Despinis v. Comm'r Soc. Sec. Admin.*, No. 2:16-cv-01373-HZ, 2017 WL 1927926, at *7 (D. Or. May 10, 2017) (finding the claimant's reliance on *Brown-Hunter* "unavailing," and stating that although "the ALJ's opinion could have more clearly stated each reason and how it served to discount Plaintiff's credibility, the Court is able to 'reasonably discern' the ALJ's path" (citing *Brown-Hunter*, 806 F.3d at 495)). Indeed, during the hearing before the ALJ, Plaintiff testified that she cannot perform even a part-time job, and that despite having the majority of her

benign tumors removed, she "just can't function" because she continues to suffer from "severe" headaches, migraines, and sinus infections. (Tr. 55-58, 62.) In his decision, the ALJ described Plaintiff's hearing testimony before concluding that it was undermined by her reported activities. (*See* Tr. 31, detailing Plaintiff's reported difficulties with severe migraines and frequent sinus infections, despite undergoing "multiple surgeries to re-sect the meningiomas," noting that Plaintiff testified that her impairments would prevent her from working "a part-time or full-time job," and cause her to "miss at least ten workdays each month" and "be off-task half the time," and then proceeding to find that Plaintiff's symptom testimony was undermined by her self-reported activities).

Given the degree of impairment alleged, the Court concludes that the ALJ's finding was both reasonable and supported by substantial evidence. (*Compare* Tr. 381-82, indicating that Plaintiff testified on March 26, 2011, that she cannot stand for more than ten minutes at a time, that she cannot sit "for long periods of time," that "lying down is the only [she can] relieve [her] pain," and that she "lie[s] in bed most of the day due to pain," Tr. 1145, noting that Plaintiff reported on July 6, 2015, that she cannot work because she can "only walk or stand a couple of minutes and sit for a half an hour" due to "severe arthritis in her back," and because she has "difficulty being around other people" due to "severe anxiety," Tr. 55-58, indicating that Plaintiff testified on November 19, 2015, that she "just can't function" due to meningioma-related impairments, such as headaches and sinus infections, *with* Tr. 565, stating that on June 8, 2010, roughly four and a half months before the alleged onset of disability, Plaintiff reported joining "24 hour fitness" and engaging in exercise five days a week (walking, using the treadmill for thirty minutes, or swimming laps for twenty minutes), Tr. 559, indicating that Plaintiff was able to eat "out every day" and go on a vacation to Disneyland and Las Vegas a few months before

the alleged onset date, Tr. 523, noting that Plaintiff reported that her activities were "limited due to recent back pain," but she was still able to go "bowling every Saturday," Tr. 481, noting on February 18, 2011, that Plaintiff was going to the gym several days a week, and that Plaintiff would engage in thirty minutes of cardio and was incorporating "some resistance exercises as well," Tr. 925, 929, noting that Plaintiff reported walking five days a week in October 2012, Tr. 1257, stating on July 12, 2013, that Plaintiff was doing water aerobics five days a week, Tr. 1530, 1552, noting that Plaintiff reported going to Las Vegas in August 2013, and being "addicted" to going to "water aerobics at least [five] times per week" in October 2013, Tr. 1348, noting that at an unspecified time between December 6, 2012 and May 28, 2014, Plaintiff informed her counselor that she goes to water aerobics five times a week, plays bingo once or twice a month, and goes to the movies, the beach, and bowling, Tr. 2076, noting on June 19, 2014, that Plaintiff denied "being unable to stay seated at meetings and gatherings," Tr. 2015, stating that Plaintiff reported going "gambling more frequently" in April 2015, Tr. 1831, observing on May 15, 2015, that Plaintiff reported "working out 5x per week for the last 2-3 weeks now").[5]

Second, the ALJ discounted Plaintiff's symptom testimony based on medical noncompliance. (See Tr. 32; see also Pl.'s Opening Br. at 21, acknowledging that the ALJ "thoroughly analyzed Plaintiff's diabetes medication compliance issues and improvement with medication"). Medical noncompliance is a clear and convincing reason for discounting a claimant's symptom testimony. See, e.g., Thebo v. Astrue, 436 F. App'x 774, 775 (9th Cir. 2011)

[5] The ALJ did not cite explicitly to all of the record evidence discussed above, but it is nevertheless appropriate for the Court to consider additional support for a ground on which the ALJ relied. See Fenton v. Colvin, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

(holding that the ALJ provided clear and convincing reasons for discounting the claimant's symptom testimony, and citing "medical noncompliance" as one of those clear and convincing reasons).

Substantial evidence supports the ALJ's decision to discount Plaintiff's symptom testimony on this ground. (*See* Tr. 626, noting on April 7, 2009, that Plaintiff had "been very noncompliant with getting [sleep apnea] testing done in past," and that she would "need insulin soon unless [her] diet gets under control [but she] has not really made any signif[icant] changes on that end," Tr. 597-98, observing on February 4, 2010, that Plaintiff was "non-complaint" with mental health medications "in the past," and that she continued to eat "out every day" and "only buy[] junk" when she goes grocery shopping," Tr. 581, noting that on May 6, 2010, Plaintiff reported that she had "stopped doing everything [she was advised to do] over the last few weeks" of diabetes management classes, Tr. 560, indicating that Plaintiff appeared for a diabetes management consultation on July 27, 2010, and that a doctor of pharmacy had a "[f]rank discussion" with Plaintiff about "her ongoing poor life choices" and observed that Plaintiff "[k]nows she needs to change, but [she is] not willing to doing anything about it," Tr. 511-12, stating on December 10, 2010, that Plaintiff "admit[ted] to eating out for nearly every meal and kn[ew] that her food choices are not the best," and that Plaintiff's diabetes was uncontrolled "mainly [due to her] poor diet and lifestyle behaviors," Tr. 506, stating on January 19, 2011, that Plaintiff understood that her weight was "playing a role" in her back issues and needed to "be addressed to prevent chronic disability," Tr. 719, noting on April 6, 2011, that Plaintiff asked her primary care physician for a "handicap parking sticker," but was denied because she had been told that "she needs to stay active," Tr. 688, observing on June 10, 2011, that Plaintiff had "been backsliding on her self-management [of diabetes], routinely missing mealtime insulin doses, not

eating appropriately," and at times, not checking her blood sugar levels "at all," Tr. 1086, observing on May 3, 2012, that Plaintiff "refuses to take insulin for fear of further weight gain," even though it causes her blood glucose levels "to run out of control" and "leads her to feel poorly and go to the ER or urgent care," Tr. 936, noting on August 2, 2012, that Plaintiff "was non-compliant with treatment plan, contract and/or [Western Psychological and Counseling Services] policies," Tr. 907, stating on August 27, 2012, that Plaintiff "has been dishonest about her insulin use as she has not been taking it but has been saying she has," Tr. 1013, stating on August 31, 2012, that Plaintiff "lied about insulin use," Tr. 1912, indicating on July 31, 2014, that Plaintiff reported "an increase of binge eating and worsened glycemic control related to her eating").

The ALJ also appeared to discount Plaintiff's testimony based on evidence that she exaggerated her symptoms. (*See* Tr. 36-37, noting that Plaintiff "appeared to exaggerate her emotional problems and her limited daily activities" when she was examined by Dr. Brischetto and that Dr. Brischetto "also noted exaggerated self-reporting," finding that the "contrast" between Plaintiff's "activities and her allegations supports Dr. Brischetto's finding of exaggerated self-reporting," and adding that Plaintiff's "activities" suggested "fewer limitations" than she has "alleged"). A claimant's exaggeration is a clear and convincing reason to discount the claimant's testimony. *Larkins v. Colvin*, 674 F. App'x 632, 633 (9th Cir. 2017) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)); *see also Gerard v. Astrue*, 406 F. App'x 229, 232 (9th Cir. 2010) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, noting that the claimant "exaggerated her left knee pain in several treatment situations," a physical therapist noted that the claimant's "claims of left knee pain did not match her presentation," and a treating doctor found the "claimed pain was

disproportionate to her physical examination," and stating that evidence of "[s]uch exaggerations support a negative credibility determination") (citation omitted). Substantial evidence supports the ALJ's finding. (*See* Tr. 1149-51, observing that Plaintiff "was not seen as a fully reliable historian," that "[t]here were some discrepancies noted in her current report from information in [Dr. Brenizer's] 2013 report," that Dr. Brischetto "had some concerns about full effort on mental status tasks" and believed that "full effort on mental status was questionable," which meant that "the data obtained may under reflect her current functioning," that although Plaintiff reported that "she could not sit for more than [thirty] minutes, she did not get up for the entire hour," even though Dr. Brischetto "gave her the opportunity to get up and stretch," and that in Dr. Brischetto's opinion, it was "likely" that Plaintiff's self-reports on the Beck Anxiety and Depression Inventories represented "some exaggerated self-reporting, as they seemed inconsistent . . . with her functioning in activities of daily living and emotional presentation" on examination).

Based on the foregoing, the Court declines to second-guess the ALJ's subjective symptom evaluation because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *see also Chesler v. Colvin*, 649 F. App'x 631, 632 (9th Cir. 2016) (holding that the ALJ provided two clear and convincing reasons for discounting a claimant's testimony, and thus concluding that, "[e]ven assuming that the ALJ erred in rejecting [the claimant's] symptom testimony for other reasons, any error was harmless" (citing *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004))); *Garza v. Astrue*, 380 F. App'x 672, 673-74 (9th Cir. 2010) ("The ALJ explicitly

provided four reasons for rejecting Garza's testimony about the severity of her pain. We do not find three of the four reasons to be clear and convincing. Nevertheless, the ALJ also implicitly found that Garza's testimony conflicted with the medical record. Coupled with the lack of objective medical evidence, these contradictions amount to substantial evidence supporting the ALJ's determination, such that any error with regard to the other three reasons was harmless.") (citation omitted).

## II.     THE ALJ'S STEP TWO SEVERITY FINDINGS

Plaintiff also argues that the ALJ committed reversible error when he failed to list Plaintiff's "three meningiomas . . . and status post meningioma removal" as a severe impairment at step two of the sequential evaluation process. (Pl.'s Opening Br. at 5.) Plaintiff's argument is unpersuasive.

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. Any alleged error at step two is harmless when: (1) the ALJ resolves step two in the claimant's favor, (2) the ALJ considers the effect of the omitted impairment at later steps of the sequential process, and (3) the ALJ accounts for any credible limitations posed by that impairment in formulating the RFC and VE hypothetical. *See Myers v. Comm'r Soc. Sec. Admin.*, No. 15-1123-YY, 2016 WL 4157206, at *2-3 (D. Or. Aug. 3, 2016) (holding that the ALJ's alleged error at step two was harmless because the ALJ resolved step two in the claimant's favor, considered the effects of her omitted impairments "in subsequent steps of the disability evaluation," and formulated an RFC "based on the evidence in the record determined to be credible"); *Then v. Colvin*, No. 15-173-TC, 2016 WL 3474274, at *3 (D. Or. Mar. 16, 2016) (noting that the claimant complained of headaches and "was properly found not credible," and thus holding that "because the ALJ need not incorporate limitations into the RFC

that he finds not credible, any error at step two in failing to find plaintiff's headaches to be severe was harmless").

Here, the ALJ resolved step two in Plaintiff's favor and considered the effects of her meningiomas in subsequent steps of the disability analysis. (*See* Tr. 27, 31, resolving step two in Plaintiff's favor, detailing Plaintiff's reported difficulties with painful migraines and frequent sinus infections after undergoing "multiple surgeries to re-sect the meningiomas," noting that Plaintiff testified that her impairments would prevent her from working "a part-time or full-time job," and cause her to "miss at least ten workdays each month" and "be off-task half the time," and then proceeding to find that Plaintiff's symptom testimony was undermined by her reported activities).

Plaintiff claims that the ALJ's error at step two was prejudicial because he did not include any meningioma-related "accommodations in the RFC," and thus failed to formulate an appropriate VE hypothetical. (Pl.'s Opening Br. at 19.) Plaintiff argues that the ALJ should have formulated an RFC that accounted for the fact that her meningioma-related symptoms would cause her to miss work at least twice a month. (*See* Pl.'s Opening Br. at 19, "Here, the ALJ does did [sic] not include any headache-related accommodations in the RFC. Furthermore, the VE testified that an individual . . . would not be able to work in a full-time competitive labor market if she missed two days a month," *see also* Pl.'s Reply at 5, "In questioning the VE, the ALJ constructed no hypothetical that would account for Plaintiff's pre-2014 living hell of daily migraines so severe they required injections. In constructing the RFC, the ALJ did not include any restrictions for the constant, disabling pain Plaintiff's meningiomas caused," *but cf.* Tr. 565, stating on June 8, 2010, roughly four and a half months before the alleged onset of disability, that Plaintiff reported joining "24 hour fitness" and engaging in exercise five days a week (walking,

using the treadmill for thirty minutes, or swimming laps for twenty minutes), Tr. 559, indicating that Plaintiff was able to eat "out every day" and go on a vacation to Disneyland and Las Vegas a few months before the alleged onset date, Tr. 481, noting on February 18, 2011, that Plaintiff was going to the gym several days a week, and that she would engage in thirty minutes of cardio and was incorporating "some resistance exercises as well," Tr. 1530, 1552, noting that Plaintiff reported going to Las Vegas in August 2013, and being "addicted" to going to "water aerobics at least 5 times per week" in October 2013, Tr. 1956, noting that Plaintiff visited her surgeon on November 13, 2014, and "[s]he ha[d] no complaints and [reported] doing very well," Tr. 1831, observing on May 15, 2015, that Plaintiff reported "working out 5x per week for the last 2-3 weeks now").

However, Plaintiff was the only one who testified that these reported symptoms would cause her to miss work at a level that would preclude gainful employment, and the ALJ provided legally sufficient reasons for discounting Plaintiff's self-reports. (*See* Tr. 55-58, 69-70, discussing Plaintiff's surgeries and ongoing difficulty with "really bad" migraines, "really bad headaches," and "reoccurring sinus infections," stating that Plaintiff "just can't function" due to these meningioma-related issues, estimating that Plaintiff gets "at least one" sinus infection a month, and estimating that Plaintiff would "probably [miss] at least ten [days of work] out of the month"). Accordingly, any error at step two was harmless. *See Myers*, 2016 WL 4157206, at *3 (noting that "any error of omission at step two was harmless," that the ALJ rejected the record evidence that "would substantiate any . . . limitations over and above those included in the RFC," and that the ALJ's RFC was "based on the evidence in the record determined to be credible").

///

///

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 21st day of February, 2018.

STACIE F. BECKERMAN
United States Magistrate Judge